Edith E. HARRISON, Plaintiff-Respondent,

v.

Louise E. HARRISON, Interpleader-Appellant,

John E. Harrison, Defendant,

3738 Corporation, a Corporation, and William C. Ferguson Company, a Corporation, Garnishees.

No. 30618.

St. Louis Court of Appeals.

Missouri.

Oct. 18, 1960.

Motion for Rehearing or to Transfer to Supreme Court Denied Nov. 18, 1960.

Sherman Landau, St. Louis, for interpleader-appellant.

Robert C. Brinkman, St. Louis, for plaintiff-respondent.

DOERNER, Commissioner.

This case involves two garnishments in aid of execution, which were consolidated and tried together. The contest below was between Edith E. Harrison, the judgment creditor, and Louise E. Harrison, the interpleader, and resulted in a judgment in favor of Edith, from which Louise has appealed.

The action had its genesis in a judgment and decree of divorce which was granted to Edith from John E. Harrison on March 4, 1953. By that decree Edith was awarded the custody of their then 14 year old son, Robert, $100 per month for his support and maintenance, and the same amount as alimony, both sums being payable semi-monthly. John was then employed as sec-

retary and treasurer, as well as office manager, of Presstite Engineering Company and exactly one month later, on April 4, 1953, he married Louise, the interpleader herein, who had worked for the same concern for six years as a switchboard operator and receptionist, under John's supervision.

The evidence shows that John paid Edith the amounts due her for alimony and child support until February 1, 1956, when he defaulted in his payments for the months of February, March and April. However, following the issuance of an execution on March 16, 1956 and the service of the writ on Presstite Engineering Company, John paid Edith, sometime before May 1, 1956, the $600 then due her. Thereafter John made no further payments, so that on February 26, 1958, the date the instant execution was issued, John owed Edith such installments for the period from May 1, 1956 through February 15, 1958, which, at $200 per month, totaled $4,400. Writs of garnishment in aid of execution were served on the William C. Ferguson Company and the 3738 Corporation (to which the name of Presstite Engineering Company had been changed) on March 4, 1958 and March 10, 1958, respectively. Following the filing of amended interrogatories, the answers of the garnishees thereto, and the replies of Edith to the answers, Louise interpleaded, claiming to be the owner of the property involved. Edith answered, denying that Louise was the owner. As made by their pleadings, the basic issue between Edith, the judgment creditor, and Louise, the interpleader, was whether the shares of stock John had owned in the garnishee corporations were transferred to Louise in good faith and for a valuable consideration, as Louise claimed; or whether such transfers were made for the purpose and with the intent of hindering, delaying or defrauding Edith in the collection of her judgment, as she claimed.

In brief, the substance of the evidence on behalf of Louise was that John had transferred the stocks to her in accordance with a pre-marital agreement made between them; while the essence of Edith's evidence was that John had demanded that Edith agree to a reduction of the judgment for child support and alimony; had threatened that he would move to Florida if she refused to agree; and that his subsequent removal to Florida, and the transfers of the stocks in question to Louise, were part of an over-all design and scheme to dispose of substantially all of his property so as to evade the collection of Edith's judgment.

On June 2, 1959, the lower court rendered its findings of fact, in which it found that Edith was a judgment creditor, of which John and Louise were aware; that the various transfers of the stock in the garnishee companies, and the increment thereof, were made by John and Louise for the purpose of defrauding, hindering and delaying Edith in the collection of her judgment; that all or substantially all of John's other assets had been transferred to the joint names of John and Louise, and had been removed to Florida, for the same purpose; and that at the time of trial there was due Edith from John the sum of $6,800 on the judgment, together with interest thereon of $621.25, or a total of $7,421.25. By its decree the court sustained the petition of Edith, ordered the garnishee corporations to pay into the registry of the court the money held by them; directed them to deliver to the sheriff the certificates for the stock; and ordered that the sheriff sell the same at public sale.

Edith testified that John made the demand for the reduction of the child support and alimony payments, and his threat to move to Florida, in March of 1955. On May 27, 1955, shortly after her refusal, John caused 1815 shares of the common stock of the then named Presstite Engineering Company, and 1650 shares of the common stock of William C. Ferguson Company, to be transferred from his name to himself and Louise, as tenants by the entirety. Subsequently, on January 3, 1956, John sold 815 shares of the Presstite stock

to that company, for $30 per share, or a total of $24,450. Shortly thereafter, on January 17, 1956, Presstite declared a 200% stock dividend, as a result of which John and Louise received 2,000 additional shares, making 3,000 in all. By a purchase agreement effective March 31, 1956, the American-Marietta Company bought substantially all of the assets of Presstite, paying therefor 90,000 shares of American-Marietta stock. Since the operations previously carried on by the Presstite Company were to be continued by American-Marietta under the name of Presstite Division, the name of the Presstite Company was changed to that of 3738 Corporation, and as part of its liquidation its stockholders surrendered their certificates of stock and received in lieu thereof receipt and distribution certificates, entitling them to an aliquot part of the assets of the company upon distribution thereof. There having been 300,000 shares of stock previously outstanding, the receipt and distribution certificate issued on April 5, 1956, to John and Louise as tenants by the entirety represented a 3,000/300,000 interest. On April 17, 1956, John surrendered that receipt and distribution certificate to the company and caused a new certificate to be issued in the name of Louise alone.

As to the stock in the William C. Ferguson Company, it stood in the name of John and Louise as tenants by the entirety from May 27, 1955, until April 17, 1956, when John caused the stock to be transferred to the name of Louise alone.

The undisputed evidence showed that at the time the first transfers were made to the names of John and Louise, as tenants by the entirety, on May 27, 1955, John was employed by the Presstite Company at a substantial remuneration; had about $6,400 on deposit in two bank accounts; owned some life insurance and several thousands of dollars of government bonds; and also owned a residence, subject to a deed of trust, the title to which he had had recorded in the name of his sister and her husband when he purchased the property in 1951.

Louise testified that John then had no financial obligations other than for current living expenses, to Edith on her judgment, and on the deed of trust. Louise's first point on appeal is that the pertinent transfers were those of May 27, 1955, and that the validity of her ownership must be judged in the light of John's financial condition at that time; that John was then in a sound financial condition; and that therefore the transfers could not have been made with the intent to hinder, delay or defraud Edith in the collection of her judgment.

■ We cannot agree with that line of argument. Under our statute, Section 428.020 RSMo 1949, V.A.M.S., every conveyance made with the intent to hinder, delay or defraud creditors is declared to be clearly and utterly void as to such creditors. While the insolvency resulting from a conveyance may be material evidence of fraud, the intent with which the conveyance is made, and not the resulting insolvency, is the determining factor. And, as was said in Graff v. Continental Auto Insurance Underwriters, Springfield, Illinois, 225 Mo.App. 85, 35 S.W.2d 926, 931:

> " * * * the authorities hold that if the intent underlying the transaction was to do that which is forbidden by statute, then it is fraudulent and void as to creditors, whether the debtor be solvent at the time or not."

Furthermore, this is not a case involving a single conveyance by a debtor of only a part of his property. What we are here called upon to consider is an action where the judgment creditor charged that the several transfers of stock which constitute the subject of this proceeding were part and parcel of a comprehensive scheme by the debtor to dispose of all or substantially all of his assets, by a series of conveyances, with the intent to hinder, delay and defraud his creditor in the collection of her judgment. It is settled law that a voluntary conveyance by a debtor of all or substantially all of his property is presumptively

fraudulent and void as to existing creditors. Conrad v. Diehl, 344 Mo. 811, 129 S.W.2d 870; Godchaux Sugars v. Quinn, Mo., 95 S.W.2d 82; Scharff v. McGaugh, 205 Mo. 344, 103 S.W. 550. Whether the debtor seeks to accomplish his proscribed purpose by a single conveyance, or by a series of conveyances, is immaterial. In that connection, see Allison v. Mildred, Mo., 307 S.W.2d 447. If John's transfers on May 27, 1955, were but the first step in a comprehensive plan to divest himself of all or substantially all of his assets, including the stock here involved, so as to defeat Edith's collection of her judgment, the mere fact that John may have temporarily retained other assets after the first conveyance would not be determinative of the validity of the initial transfers.

 Louise's next point is that the findings of fact were not supported by the evidence and were contrary to the evidence. The trial having been upon the facts, without a jury, our review on appeal is upon both the law and the evidence as in suits of an equitable nature. While we are not bound by the trial court's findings and have the authority as well as the duty to consider the evidence and make our own findings of fact, the judgment should not be set aside unless clearly erroneous, and due regard must be given to the opportunity of the trial court to judge of the credibility of the witnesses. Section 73.01, Rules of Civil Procedure, V.A.M.R.; Davis v. Ashlock and Chowning et al., Mo., 338 S.W.2d 816; Turner v. Mitchell, Mo., 297 S.W.2d 458. From a careful study of the record, we are convinced that the evidence preponderated in favor of the judgment creditor. As gathered from the evidence, at the time John made his threat to remove to Florida, in March of 1955, the subject stock was registered in his name alone, and in addition, he owned the residence on Carondelet Boulevard, had substantial bank accounts in his name alone in two banks in St. Louis, and held a safe deposit box in one of such banks. After the initial transfers of the subject stocks to his name and that of Louise, as tenants by the entirety, which followed closely upon his differences with Edith, John and Louise purchased a lot in Vero Beach, Florida, in August, 1955, and had a house erected thereon, title thereto being taken in their names by the entirety. The entire cost of the house, about $14,000, was paid for by John, in part from money on deposit in one of his bank accounts. On November 10, 1955, John sold the residence on Carondelet Boulevard where he and Louise lived. About the time the home in Vero Beach was completed, John resigned from his position with the Presstite Company, and he and Louise moved to Vero Beach, in February, 1956. He also closed his bank accounts in St. Louis, and surrendered his safe deposit box. According to Louise's own testimony, he did not, however, open any bank account in Florida, nor, apparently, did he rent a safe deposit box there, for she related that John kept the subject certificates of stock in his home. As testified to by Louise, all of John's assets at the time of trial were held in his name and hers; in addition to the home in Vero Beach they included their automobile, a small orange grove, and other shares of stock. Louise related that John had not been employed since they moved to Florida, and that she had been only casually employed; and that John paid all of the bills for their living expenses—how, she did not know. As stated earlier, as soon as John had completed the removal of himself and his assets to Florida, he immediately ceased paying Edith the installments due her by virtue of her judgment.

John filed one motion but thereafter took no further part in the proceedings. He did not appear as a witness at the trial, and Louise's claim as to the consideration upon which she based her claim of ownership rested upon her testimony alone. She testified that when John asked her to marry him, about the middle of March, 1953, she was hesitant to give up her salary (shown by other evidence to have been $54.80 per week, gross) and the social security and

pension for her old age; that John told her if she would marry him and take care of his home and his aged mother, " * * * that he would at some future date, he didn't say a specific date, put some Presstite stock in my name, and I asked him about what the stock would be worth, and he could not give me a definite figure, because he said at that time it (sic) was going to be some changes in the stock." Subsequently, Louise stated that John told her the Presstite stock was then worth between $10,000 and $12,000; and that the change which was to be made in the stock was something about a spin-off, which she did not understand. She testified that pursuant to her understanding with John she had relinquished her position with Presstite, thus giving up her salary, and possible pension; and that she had taken care of John's home and of his mother until the latter suffered a mental collapse.

Louise related that in May or June of 1955, John told her that the spin-off had taken place, and that he had put some stock in her name, but she admitted that she didn't know how much or how many shares. She also admitted that she had never voted either the Presstite or the Ferguson stock or exercised any control over them; that John had continued to handle the stock since they were placed in their joint names; and that so far as she knew, no dividends had been paid on either stock, and if dividends were paid (and other evidence indicated they were), she has not seen them.

Over two years elapsed between the date of the marriage of John and Louise and the first transfer of stock made by John. There was no evidence produced of any spin-off of the assets of the Presstite Company. The argument is made in the brief that John was anticipating something in the nature of the changes which ultimately occurred in 1956. Just what difference that would have made to John in 1953 if the Presstite stock was then to be given to Louise is not made clear; and William Meckel, who was treasurer of Presstite after John resigned, testified that as late as January 3, 1956, he didn't know the assets

of the Presstite Company were to be sold. Furthermore, no reason at all was advanced as to why John first transferred the Presstite stock to his name and Louise's, as tenants by the entirety, rather than to Louise's name alone. The timing of the transfer to the joint names, occurring so closely following John's dispute with Edith over the child support and alimony payments, indicates an effort to place the stock beyond reach of Edith's judgment. It was only after John stopped paying, in February, 1956, and Edith ran her first execution, which was released upon payment of the $600 then due, that John transferred what he then owned, the receipt and distribution certificate in the 3738 Corporation, to Louise's name alone. In the meantime, in January, 1956, John had sold 815 shares of the Presstite stock to that company for the sum of $24,450. No claim was made by Louise that she had received any of that money, as might have been expected if the stock John had promised to give her was worth $10,000 or $12,000 in 1953.

As to John's stock in the Ferguson Company, there was not a scintilla of evidence offered by Louise tending to establish the good faith of the various transfers of that stock. An attempt is made in the brief to link the Ferguson stock with the Presstite stock, but no evidence in the record supports the argument made. Furthermore, it is difficult to understand how John could have agreed to transfer the Ferguson stock to Louise as part of their claimed pre-marital agreement when the stock record books of that company disclosed that John's first acquisition of such stock did not occur until October 1, 1953, almost six months after their marriage.

 While it may be true, as Louise contends, that a husband may convey property to his wife in fulfillment of a valid pre-marital agreement, it is likewise true that transactions between a husband and wife to the prejudice of the husband's creditors are looked upon with suspicion, and their good faith must be so clearly shown that there

can be no reasonable doubt of the honesty of the transactions. Bank of New Cambria v. Briggs, Mo., 236 S.W.2d 289; Oetting v. Green, 350 Mo. 457, 166 S.W.2d 548; Conrad v. Diehl, supra. Here, as in other types of actions, Edith had the burden of proving the fraud charged. Oetting v. Green, supra. Proof of such fraud may, however, be established by circumstantial evidence. Shepherd v. Woodson, Mo., 328 S.W.2d 1; Allison v. Mildred, supra. Certain circumstances so frequently attend conveyances to hinder, delay or defraud creditors that the courts recognize and refer to them as indicia or badges of fraud, among them being: a conveyance to a spouse or near relative; inadequacy of consideration; the transfer of all or nearly all of a debtor's property; insolvency; retention of possession by the debtor; and the failure to produce available or rebutting evidence when the circumstances surrounding the transfer are suspicious. Allison v. Mildred, supra; Conrad v. Diehl, supra; Matz v. Miami Club Restaurant, Mo.App., 108 S.W.2d 975. And while none may by itself establish fraud, a strong inference of fraud arises from the concurrence of several of such badges. Allison v. Mildred, supra; Conrad v. Diehl, supra.

Since Louise admittedly had paid nothing for the distribution certificate and the shares of stock ultimately registered in her name, the transfers to her were voluntary conveyances within the meaning of that term. Scharff v. McGaugh, supra. A voluntary conveyance of property is presumptively fraudulent and void as to existing creditors, and when a creditor presents evidence of such a conveyance by a debtor, accompanied by other badges of fraud, the burden of producing evidence to establish the good faith of the transaction shifts to the grantee or donee. Godchaux Sugars v. Quinn, supra; Scharff v. McGaugh, supra. The claim by Louise that the transfers were made to her in consideration of a pre-marital agreement is far from convincing, and was totally uncorroborated by any evidence other than her own. Taking into account all of the evidence, including that of Louise's knowledge at all times of Edith's judgment, the only conclusion that can be reached is that the transfers in question were part and parcel of a comprehensive plan by John, joined in by Louise, to so convey and dispose of all or substantially all of John's property so as to hinder, delay and defraud Edith in the collection of her judgment.

The next point raised by Louise is that the judgment that Edith be paid $7,421.25 out of the proceeds of the property is erroneous and excessive. The argument made is based on the fact that the judgment is greater than the amount of $4,400 stated in the affidavit Edith filed in order to procure issuance of the execution. The second subdivision of Section 521.560 RSMo 1949, V.A.M.S., and Workman v. Anderson, Mo., 297 S.W.2d 519, 523, are cited in support of the argument. As the case cited makes abundantly clear, Section 521.560 is found in the chapter on attachments, and the limitation in the second subdivision that the execution shall be a special fieri facias against the property attached, " * * * and shall not be for more than the amount sworn to in the affidavit for the attachment, with interest and costs thereon" has reference only to a special judgment where service has been obtained by attachment. For that matter, by Section 521.380, the special judgment is likewise limited to the amount sworn to in plaintiff's affidavit. The judgment in favor of Edith was a general judgment, and the authorities cited obviously have no application to a general judgment.

However, the amount directed to be paid to Edith is excessive, but for a different reason, and since Louise posted a supersedeas bond in order to obtain the release to her of the property held by the garnishees, she is adversely affected by the amount to be paid Edith. The judgment obtained by Edith in the divorce action was a judgment for money, payable in installments. Subject to the incidents of money judgments, such a judgment is enforceable by execu-

tion as to installments which are in arrears. Mayes v. Mayes, 342 Mo. 401, 116 S.W.2d 1; Steckler v. Steckler, Mo.App., 293 S.W.2d 129; Hagemann v. Pinska, 225 Mo. App. 521, 37 S.W.2d 463. But an execution cannot be obtained for an amount in excess of that which is due and payable at the time it is issued. Schmidt v. Schmidt, 26 Mo. 235; Pflanz v. Pflanz, 237 Mo.App. 873, 177 S.W.2d 631. The writ of execution issued herein was in the statutory form, (see Section 513.025 RSMo 1949, V.A.M.S.), and commanded the sheriff to seize sufficient goods, chattels and real estate of John's to satisfy the sum of $4,400 due. The writs of garnishment likewise were in the statutory form, and attached John's property in the hands of the garnishees or "* * * so much thereof, as shall be sufficient to satisfy the debt, interest and cost in the above entitled cause." It follows that Edith cannot recover more than the amount specified in the writs of execution and garnishment.

 Apparently what was lost sight of here is that this entire proceeding was nothing more than a garnishment in aid of execution. Such a garnishment is a statutory, legal proceeding, and is merely an ancillary remedy to obtain payment of the judgment. Nacy v. Le Page, 341 Mo. 1039, 111 S.W.2d 25, 114 A.L.R. 259. And a valid judgment and execution against the debtor are the basic foundations upon which a writ of garnishment rests. Flynn v. Janssen, Mo., 284 S.W.2d 421; Barnes v. Hilton, Mo.App., 323 S.W.2d 831. The action was not converted into a creditor's bill in equity, as Edith contends, nor do the cases cited by her support her position. The mere fact that the proceedings developed into a controversy between the judgment creditor on the one hand, and the interpleader on the other, over the ownership of the property seized, did not change the character of the action. Intervention in a garnishment by an interpleader claiming the property seized is specifically provided for in the chapter on garnishments, Section 525.090 RSMo 1949, V.A.M.S.; and in such a proceedings the sole issue is the ownership and right of the interpleader to the property. Baden Bank of St. Louis v. Trapp, Mo.App., 180 S.W.2d 755; Chapman v. Yancey, 173 Mo.App. 132, 155 S.W. 1087. If some question of equities should arise, it can be determined under the interplea. Baden Bank of St. Louis v. Trapp, supra. But, the statutory character of the proceedings is not changed.

 Following the entry of the judgment and decree, Louise filed a motion to dissolve the attachment and garnishment, on the grounds that the service by the sheriff was invalid and that the court lacked jurisdiction over the American-Marietta and Ferguson stock. The overruling of that motion forms the basis of her final point on appeal. Even if Louise had raised such questions at the outset of her interplea there would have been grave doubts whether she could have done so, for while there are some cases to the contrary, the decisions in Missouri and in a majority of other jurisdictions appear to support the rule that the regularity and validity of the proceedings cannot be attacked by the interpleader. Scott v. Levan, Mo.App., 286 S.W. 407; Johnson v. Mason, 178 Mo.App. 109, 163 S.W. 260; H. B. Claflin Co. v. Harrison, 44 Fla. 218, 31 So. 818; Bulluck v. Haley, 198 N.C. 355, 151 S.E. 731; Yellow Pine Lumber Co. v. Mays, 81 W.Va. 46, 94 S.E. 42. In any event, in this case the attempted transfers of the stock from John to Louise were void, as against Edith, the judgment creditor of John. Therefore only John, the owner, could have contested the validity of the levy, which he did not do. That issue is immaterial so far as Louise is concerned, and she is in no position to raise it on appeal, Boatmen's National Bank of St. Louis v. Rogers, 352 Mo. 763, 179 S.W.2d 102; Duffley v. McCaskey, 345

Mo. 550, 134 S.W.2d 62, 126 A.L.R. 853; Summers v. Cordell, Mo., 187 S.W. 5.

The Commissioner therefore recommends that all of the judgment be affirmed except that part relating to the amount of recovery, which should be reversed; and that the cause be remanded with directions to enter a new judgment in accordance with the views indicated herein.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of the court.

Accordingly, judgment is affirmed except that part relating to the amount of recovery, which is reversed; and the cause remanded with directions.

WOLFE, P. J., and ANDERSON and RUDDY, JJ., concur.